

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

FILED

SEP 24 2018

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

BY _____
DEPUTY CLERK

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify<br>the person by name and address)*<br><br>The Residence, outbuildings, and curtilage<br>located at 13468 Avenue 416, Orosi, California<br>93647 | ) Case No:<br>)<br>) **1: 1 8 SW - 0 0 3 7 8 BAM**<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property: *(identify the person or describe the property to be searched and give its location)*

13468 Avenue 416, Orosi, California 93647

located in the <u>Eastern</u> District of <u>California,</u> there is now concealed *(identify the person or describe the property to be seized:*

**the information and items set forth in Attachments B and C which are incorporated herein by this reference.**

The basis for the search under Fed. R. Crim. P. 41 (c) is *(check one or more)*:
☒ evidence a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

This search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 7 USC 2156 | Animal Fighting Venture |
| 18 USC 922(a)(1)(A) | Manufacturing/Dealing Firearms without a License |
| 26 USC 5861(d) | Receiving or possessing a firearm which is not registered in the National Firearms<br>Registration and Transfer Record |

The application is based on these facts:

☒ Continued on the attached.
☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested under
18 U.S.C. § 3103a, the basis of which is set for the on the attached sheet.

*Applicant's signature*

<u>Erika Marin, Special Agent, USDA-OIG</u>
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/24/18

*Judge's signature*

City and State: <u>Fresno, California</u>

<u>Barbara A. McAuliffe, U.S. Magistrate Judge</u>
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Erika Marin, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the structures (including outbuildings and

curtilage) located at **13468 Avenue 416, Orosi, California, 93647,** (hereinafter the

"**RESIDENCE**") further described in Attachment A for the things described in Attachment B.

2.      I am a Special Agent with the U.S. Department of Agriculture (USDA), Office of

Inspector General (OIG) – Investigations, Fresno, California, and have been so employed since

June 2005.  As an OIG Special Agent, I am responsible for investigating individuals and

business entities that have allegedly violated federal criminal laws in connection with programs

administered by USDA or agencies within USDA, including violations of the Animal Welfare

Act, specifically illegal animal fighting.  I received a Bachelor of Science in Justice Studies from

Arizona State University in May 2001.  I am a graduate of the Federal Law Enforcement

Training Center at Glynco, Georgia.  As a Special Agent with the USDA-OIG, I have received

training in the laws of search and seizure, and I have been the affiant for thirteen search warrants.

During the course of my employment as a Special Agent, I have assisted in multiple animal

fighting investigations, including the service of search warrants on residences of cockfighting

promoters and participants.  I have worked with confidential informants to gather information

and evidence related to cockfighting. I have attended various presentations and training courses on animal fighting investigations. I have also consulted with other USDA-OIG special agents who have special training and experience related to animal fighting offenses.

3. I make this affidavit based on personal knowledge, as well as information obtained from a Confidential Informant (CI), documents, electronic databases, and other law enforcement agents involved in this investigation. The information contained in this affidavit is provided for the limited purpose of seeking authorization for a warrant to search the **RESIDENCE** described herein. I have not set forth every fact learned during the course of the investigation. Facts not set forth herein are not being relied upon in reaching my conclusion that a search warrant should be issued.

4. This affidavit is submitted in support of an application for a search warrant for contraband, evidence of a crime, fruits of a crime, and instrumentalities of violations of: Title 7, United States Code, Section 2156(a) (sponsoring or exhibiting an animal in, attending, or causing an individual who has not attained the age of 16 to attend, an animal fighting venture), Title 7, United States Code, Section 2156(b) (buying, selling, delivering, possessing, training, or transporting animals for participation in animal fighting venture), and Title 18, United States Code, Section 371 (conspiracy to commit any of the foregoing offenses). As set forth below, I have probable cause to believe such items, as set forth in Attachment B, which is attached hereto and incorporated herein by this reference, are currently located within the **RESIDENCE**, which is owned by PEDRO GAVINO ROBLES (hereinafter referred to as "ROBLES"), who resides in the County of Tulare in the Eastern District of California, more fully described in Attachment A, which is also attached hereto and incorporated herein by this reference.

5.     The statements contained in this affidavit are based in part on: information provided by law enforcement involved in this investigation; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents; information gathered from a CI involved in the investigation; and my experience, training and background as a Special Agent with the USDA-OIG.

6.     Because this affidavit is being submitted for the limited purpose of securing authorization for the requested search warrant, I have not included every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish the necessary foundation and sufficient probable for the requested warrant.

7.     This search warrant application is part of an investigation into firearms trafficking by PEDRO GAVINO, and the buying, possessing, and selling of roosters in furtherance of illegal animal fighting by PEDRO GAVINO ROBLES and PEDRO GAVINO, father and son, respectively.

8.     The property to be searched are the structures and curtilage located at **13468 Avenue 416, Orosi, California, 93647** (**RESIDENCE**). The **RESIDENCE** is owned by ROBLES. The **RESIDENCE** is a single story mobile home with multiple structures that sit on approximately 17 acres of rural property. The entrance to the property is off Avenue 416 and contains a posted sign that says "Rancho El Paraiso." There is a narrow dirt driveway approximately one-quarter of a mile long before arriving at the mobile home. The mobile home is gray in color with vinyl siding and light trim. The front door faces east and opens inward from right to left. There is no security gate on the front door.

9.     The applied-for warrant would authorize the search of the **RESIDENCE** for the

3

purpose of identifying and seizing items particularly described in Attachment B.

## BACKGROUND

10.    Cockfighting is a game or contest of chance in which a knife, a gaff, or other sharp instrument is attached to the legs of gamecocks or roosters for the purpose of fighting each other. The fight occurs in a pit or ring surrounded by spectators. A referee supervises the fights between the roosters. The fight is ended when one rooster is dead or refuses to continue to fight. If not killed during the fight, the losing rooster is usually killed after the fight. A series of cockfights conducted in a day is referred to as a derby. A derby usually consists of dozens of individual cockfights lasting for several hours depending on the number of entries.

11.    Participants in cockfighting include: (1) a promoter, who generally makes arrangements and oversees activities at the derby; (2) handlers or pitters, who prepare and handle birds during a fight and may be the actual owner of the bird or someone paid to do the job; (3) referees, who officiate in the pit during the cockfight; (4) spectators, who attend and watch the cockfights; and (5) concession workers, who sell food and drink.

12.    In a derby, a number of entrants or cockfighters pay a predetermined entry fee to enter a pre-set number of roosters, usually about five per cockfighter. The roosters are usually matched within a few ounces of each other prior to fighting. The cockfighter whose roosters win the most fights in a derby wins the purse, which consists of all the entry fees of the derby participants, less approximately 10% kept by the "house" or promoter(s). In the event of a tie, the purse is split among the winners. Sometimes the purse is divided among the first-place and second-place winners. Side bets also may occur between and among cockfighters.

4

13. Aside from the gambling, the sponsor or promoter often derives profits from admission fees and concession sales, including the sale of alcoholic beverages. Individuals may profit from the sale or raffle of related paraphernalia, including, but not limited to gaffs, tie cords, cages, training equipment, medications, and veterinary supplies.

14. For the purposes of this application for a search warrant, the term "rooster" is synonymous with the terms "gamecock," "cock," "bird," and "chicken." A mature gamecock resembles an ordinary rooster, except it has been surgically altered, trained and conditioned for fighting. Gamecocks also generally receive vitamins, drugs and other supplements to boost their strength and endurance. Roosters that are bred for the purpose of fighting are trained and conditioned to attack another rooster it comes in contact with, and must be housed individually in a pen or cage. During the late summer and fall, cockfighting derbies generally do not take place because the roosters lose their feathers.

15. Cockfighting participants often utilize the internet and computers to further their activities. Various websites carry cockfighting information about techniques, birds, breed characteristics, and news related to cockfighting.

16. Cockfighting paraphernalia, including, but not limited, to vitamins and supplements (used to condition birds), drugs (including, but not limited to, methamphetamine and cocaine, which are sometimes given to roosters as stimulants), veterinary supplies (to treat wounded roosters), training devices (including, but not limited to, padded benches and sparring muffs), knives (also referred to as blades, gaffs, etc.), scales for weighing roosters, a pit or arena, straps, tape, waxed string, cages, boxes for transporting roosters, breeding records, trophies, and other items are valuable and are maintained by individuals who raise/fight roosters. Based on

5

my training and experience, these items are often kept in residences and around cockfighting farms.

17.     Firearms are frequently found at cockfighting sites, which are brought for the purpose of personal protection by attendees due to the large amount of currency at these locations.

18.     Individuals involved in firearms trafficking commonly maintain addresses or telephone numbers in books, papers, and cellular telephones which reflect names, addresses, and/or telephone numbers of their associates in the firearms trafficking organization, even if these items might be in code. These items are kept in secure locations within the residences, offices, garages, automobiles, storage lockers, and safe deposit boxes, or on their persons for ready access and to conceal such items from law enforcement authorities.

19.     Individuals involved in firearms trafficking frequently take, or cause to be taken, photographs of themselves, their associates, their property, and their product (controlled substances). These items are kept in secure locations within their cellular telephones, residences, offices, garages, automobiles, storage lockers, and safe deposit boxes, for ready access to and to conceal such items from law enforcement authorities.

20.     Individuals involved in legitimate and/or illicit activities often maintain documentary evidence of their crimes for long periods of time. The evidence may be necessary business records that must be kept for information reporting purposes, such as for state and Federal tax returns, and loan applications. The evidence may also be innocuous at first glance (*e.g.*, financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check

books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence. The criminal offender may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. The criminal offender may also be under the mistaken belief that he/she has deleted, hidden or further destroyed any computer-related evidence that may be retrievable by a trained forensic computer expert.

21. I know based on my training and experience that cellular telephones are commonly used by firearm traffickers to organize the acquisition and distribution of firearms. I also know that in this case cellular telephones were used by both ROBLES and GAVINO to facilitate the sales of firearms and fighting roosters.

(a) In general terms, the information to be found on cellular telephones is useful in identifying and/or verifying the user of the telephone and his/her co-conspirators. The digital, cellular, and/or telephone numbers and/or the direct connect numbers assigned to the device, as well as the device's serial number, allow law enforcement to discover subscriber information as well as other devices that the target device has communicated with which, in turn, would lead to more subscriber information. The call and direct connect history information can reveal specific information about the phone numbers that the target devices have communicated as well as the time and duration of those calls. The list of contacts stored on the device potentially names co-conspirators of the crime.

(b) Information on the device that does not lead to co-conspirators is still useful in identifying the user of the device (for example, if "Mom" appears in the address book of the phone, that contact will likely identify the user of the phone).

(c) Cellular devices today can serve several functions: telephones, text messaging, cameras, personal digital assistants, calendars, address books, mini-computers allowing for electronic mail services, internet services, and rudimentary word processing.

(d) Following the issuance of this warrant, I or another assisting investigative agent will collect the cellular telephones seized pursuant to this warrant, and, with assistance from cellular telephone forensic examiners, will attempt to securely power the device, identify whether it is protected by a person identification number (PIN), determine or circumvent the PIN and image or retrieve data subject to seizure pursuant to this warrant from the device.

(e) The search of the cellular telephones will be for all records described herein on the devices that relate to violations of Title 7, United States Code, Section 2156 (animal fighting venture offenses); Title 18, United States Code, Section 922(a)(1)(A) (manufacturing/dealing in firearms without a license); Title 26, United States Code, Section 5861(d) (receiving or possessing firearms not registered in the National Firearms Registration and Transfer Record), including:

    i.      lists of customers and related identifying information;

    ii.     types, amounts and prices of firearms as well as dates, places, and amounts of specific transactions;

    iii.    any information related to sources of firearms (including names, addresses, phone numbers, or any other identifying information);

8

iv.     any information recording the individual's schedule or travel from January 1, 2017, to the present;

v.      all bank records, checks, credit card bills, account information, and other financial records;

vi.     the search of the device or of an image of the data on the device will be limited to identifying and seizing data subject to seizure pursuant to this warrant, including digital, cellular, and/or telephone numbers and/or direct connect numbers assigned to the device; call and direct connect history information; the serial number and identifying information from the cellular telephone that will help identify the cellular telephone subscriber; any lists of contacts stored on the device; any text messages or emails relating to animal fighting ventures and firearms; and any photographs depicting animal fighting ventures and firearms or proceeds of animal fighting ventures and firearms trafficking; and conspirators or individuals involved in animal fighting ventures and firearms trafficking, including customers.

(f)     Analyzing electronic handheld devices for criminal evidence can be a highly technical process requiring expert skill and a properly controlled environment. Such devices utilize a vast array of different operating systems, software, and set-ups. The variety of hardware and software available requires even experts to specialize in some systems and applications. Thus it is difficult to know prior to the search which expert possesses sufficient specialized skill to best analyze the system and its data. No matter which system is used,

9

however, data analysis protocols are exacting scientific procedures, designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since electronic evidence is extremely vulnerable to tampering or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis. Furthermore, there are often no software tools designed for forensic searches of particular handheld devices. For the foregoing reasons, the devices will be removed from the searched premises if the agent deems it necessary in order to conduct an efficient, complete, secure, and accurate search of the device. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described above.

## USE OF CONFIDENTIAL INFORMANT

22.     A confidential informant (CI) was utilized during the course of this investigation. The CI has been working under the direction of ATF Special Agent Mickel Sexton and USDA-OIG Special Agent Erika Marin assigned to Fresno, California.

23.     The CI has provided information towards this investigation in return for monetary compensation. The CI is considered to be a professional CI and has worked with several law enforcement agencies approximately over the past decade. The CI has been found to be truthful and reliable in the past and during this investigation. I know of no negative information bearing on the CI's credibility. The CI has a criminal history, which includes two misdemeanor convictions for the following crimes: failure to appear and assault-domestic violence. The CI has demonstrated knowledge of the firearm trafficking sub-culture and is familiar with methods used to distribute firearms. The CI has demonstrated knowledge of the rooster fighting sub-

10

culture and methods used to train and fight roosters. The information provided by the CI

towards this investigation has been corroborated through review of police reports, criminal

histories and through surveillance. The information provided by the CI has been relied upon by

the investigative team and has proven to be accurate. During this investigation, the CI has

conducted at least nine controlled purchases of either firearms or fighting roosters with fighting

implements while under the direction of the ATF and USDA-OIG. During each of the controlled

purchases, the CI has worn a recording and transmitting device. These recordings have been

reviewed following transactions and appear to accurately reflect the reporting provided by the

CI.

## **PROBABLE CAUSE**

24.     On April 12, 2017,[1] the CI contacted GAVINO by calling GAVINO's cell phone

number, (559) 786-8874 (referenced herein as "GAVINO's phone"). According to ATF Special

Agent Mickel Sexton, who has assisted in investigating firearms offenses in this matter, this

phone number is subscribed to GAVINO. This call was recorded. During the call, the CI asked

GAVINO about the roosters he had posted on his Facebook account. GAVINO responded, "No .

. . I'm going to fight those." The CI told GAVINO he/she had some extra money and wanted to

get into rooster fighting. GAVINO replied, "I can sell you roosters; we got over 200 roosters,

bro. I can sell you as many as you want." The CI asked what kind of roosters GAVINO had

available. GAVINO stated they have multiple breeds, including roosters from Alabama and

---

[1] Any references herein to dates and times are to approximate dates and times.

11

Kentucky. GAVINO further stated that birds that were ready to fight, also known as battle roosters, were $200.

25. On April 17, 2017, the CI received a call from GAVINO's phone. During the call, which was recorded, GAVINO said he had access to some Glocks and a Ruger that looks like a Tec-9 that is supposed to be a machine gun. He also indicated that the Ruger costs $1,200 and the Glocks cost $1,000.

26. On April 23, 2017, the CI contacted GAVINO's phone. During the call, which was recorded, GAVINO said he has a .380 pistol and could get a Glock and little Ruger from his "white boy." They also discussed prices of the firearms. GAVINO indicated he could get anything, including SKS's and AR's, but he said the firearms are hard to get in the streets without paperwork.

27. On April 24, 2017, the CI contacted GAVINO's phone. During the call, which was recorded, the CI and GAVINO discussed the CI's arrival schedule to Fresno to discuss going into the rooster fighting business. The CI asked GAVINO if he was going to the fights. GAVINO replied, "There's no fights till Thursday, Friday, Saturday, and Sunday." GAVINO then instructed the CI to call him to come by and "check out all the birds we got. I got a shitload of birds."

28. On April 25, 2017, the CI contacted GAVINO's phone. During the call, which was recorded, GAVINO asked the CI what he/she wanted to do with the roosters. The CI told GAVINO he/she wanted to fight/breed them. GAVINO asked where the CI was going to keep the birds. The CI and GAVINO agreed to meet at the **RESIDENCE** at 8:00 a.m. the following morning.

29. On April 26, 2017, the CI met GAVINO at the **RESIDENCE** to discuss the purchase of fighting roosters. A video recording of the meeting was obtained by the CI utilizing his/her cell phone and provided to SA Mickel Sexton and SA Marin for review. The video showed GAVINO, an older Hispanic male introduced as GAVINO's father and subsequently identified as ROBLES, and an unidentified juvenile male touring the **RESIDENCE**. It appeared that approximately 200 roosters were housed at the **RESIDENCE**. GAVINO and ROBLES discussed the differences in various breeds of roosters they had available. GAVINO sparred multiple pairs of roosters for the CI and noted the differences between the breeds and associated costs of the roosters.

30. On May 24, 2017, the CI contacted GAVINO's phone. During the call, which was recorded, the CI and GAVINO arranged to meet the following week and discussed the possibility of attending a cockfight. The CI told GAVINO he/she still needed to buy some pens from him and his father to house the roosters.

31. On May 28, 2017, the CI contacted GAVINO's phone. During the call, which as recorded, the CI asked GAVINO if he went to the fights. GAVINO stated that there were some Filipino fights next to his **RESIDENCE** going on right now. GAVINO advised, "They fight long knives," referring to the length of the blade attached to the roosters during a cockfight. The CI asked GAVINO if he was going. GAVINO replied, "I usually go because it's walking distance from my house." He further stated there were fights on Thursdays and Saturday afternoons and on Sunday mornings. The CI and GAVINO then discussed the purchase of firearms. The CI told GAVINO they would plan to meet on Thursday to purchase firearms and attend a cockfight.

13

32. On June 1, 2018, the CI purchased an AR-15 type pistol with no serial number or manufacture markings and a .380 caliber pistol from GAVINO for $2,300 in front of the **RESIDENCE**.

33. On June 2, 2017, the CI contacted GAVINO's phone. During the call, which was recorded, the CI asked GAVINO if there were any cockfights that weekend. GAVINO stated there would be fights on Saturday and Sunday, but he would not know where until the day of the fight.

34. On June 8, 2017, the CI contacted GAVINO's phone. During the call, which was recorded, GAVINO told the CI that he and his father were leaving for the cockfight at 3:00 p.m., and asked whether the CI wanted to go. If so, the CI needed to be at the **RESIDENCE** before that time. GAVINO stated that his father was taking some random birds that had not been trained.

35. On June 8, 2017, the CI attended a cockfight with GAVINO and ROBLES. The CI stated the fights took place in the middle of an orchard near Porterville, California. There were approximately 100 to 150 attendees. The entrance fee for spectators was $20. The entry fee for birds fighting was $400. The CI observed bets being placed at $500 to $1,000; however, he/she observed a bet as high as $5,000. Additionally, side bets of $70 to $80 also occurred. There were 30 to 33 fights consisting of three-bird derbies. There were approximately 17 contestants, including ROBLES. Each contestant put $400 into an envelope. The CI, GAVINO, and ROBLES split the $400 entry fee: the CI put in $100, GAVINO put in $150, and ROBLES put in $150. ROBLES took four birds to fight. There was one win, one loss, and two draws. Two birds survived and two were killed. GAVINO tied the blades to these birds. The blades came

14

from GAVINO'S vehicle. The CI observed at least six individuals who appeared to be involved in the organization: one male collecting the entrance fee; one male collecting the entry fee for birds; two male referees; and two food vendors (not sure I would include food vendors). The male collecting the entry fee for the birds also weighed the birds and gave the fighters some type of band to place around the foot of each bird. The CI observed at least three individuals with approximately $10,000 in their pockets. One male had over $30,000 cash on him. No drugs were observed; however, the CI detected the odor of marijuana. ROBLES told the CI, "If the cops come, don't run because we might not find you. All they'll do is give you a ticket." ROBLES appeared to be a well-respected man with the crowd. He was approached by several people who shook his hand and introduced themselves to the CI since he/she was with ROBLES.

36. On February 14, 2018, the CI met with GAVINO and purchased one AR-15 type short barrel rifle, made from an unfinished receiver, no serial number, with magazine and one NORINCO, model SKS, 7.62 caliber rifle, serial number: 22003978 with magazine. In addition, the CI purchased two live roosters, and one half-dozen short knives, also known as Mexican slashers, for a total of $650. The CI paid GAVINO $400 for the two roosters and $150 for the half-set of knives.

37. On April 5, 2018, the CI went to the **RESIDENCE** and met with ROBLES to discuss fighting roosters. The CI stated to ROBLES that he/she had six roosters and would be fighting them in May at a big tournament in Utah. The CI asked if he/she needed to feed or give the birds anything different a few weeks prior to fighting. ROBLES stated he trains the birds and gives them vitamin shots three weeks before he fights them. ROBLES then walked the CI over to the pens where the birds were being housed. He further explained that "if you really want

15

them to fight good, you got to train them, you got to feed them, and the last couple of days are very important. You gotta kind of put them on a diet and make sure they're well rested. It's a lot to do." ROBLES and the CI observed the roosters while ROBLES gave further instructions on how to administer vitamin B-12 5000 shots and how to condition the birds prior to the fight.

38. On April 15, 2018, the CI attended a cockfighting derby with GAVINO, ROBLES, and ROBLES' neighbor, VICTOR, who rents a trailer on ROBLES's property. The CI described the trailer as the number one trailer if one is looking west to east. The CI observed ROBLES holding a camouflage fanny pack that contained fighting knives. ROBLES retrieved five birds from his **RESIDENCE** to take to the derby. ROBLES gave a vitamin shot to each bird prior to leaving the **RESIDENCE**. The CI related that all cockfighting paraphernalia, including the fanny pack, was stored in the building adjacent to the pens where the birds are kept. The derby took place approximately 1.5 miles from the **RESIDENCE** off Road 142 in Orosi. As they arrived at the derby, each attendee was charged $20. There were approximately 200 to 300 spectators, 47 entries, and over 200 birds present. The entry fee for the three-bird derby was $400. The purse was estimated to be $18,800. ROBLES, GAVINO, VICTOR, and CI each put in $100 to cover the entry fee for ROBLES' three birds. Side bets were anywhere from $20 to $500. A female food vendor was present and sold tacos, tortas, and beer. The CI observed spectators smoking marijuana.

39. Photos and videos posted on ROBLES's Facebook account show various breeds of roosters that are held in individual pens and cages. The combs and waddles of the roosters appear to have been removed, which is an indicator that these birds have been bred and trained to fight.

16

40.     On July 26, 2018, the California Highway Patrol conducted a fly over of the

**RESIDENCE** and provided SA Sexton and me with several still images of the property.  The

aerial images show what appear to be individual metal cages that are covered by a metal roof,

likely to protect the birds from the sun and other elements.  Some of the images capture roosters

housed inside the pens.

## CONCLUSION

41.     Based on the foregoing, I submit that there is probable cause to believe that

GAVINO and ROBLES are in possession of fighting roosters, knives/blades, supplements, and

other cockfighting implements for participation in animal fighting ventures, and evidence of

cockfighting is going to be found at the **RESIDENCE** at **13468 Avenue 416, Orosi, California,**

**93647**.  I also submit that there is probable cause to believe that evidence of firearms trafficking

will be found at the **RESIDENCE**.

42.    Based on the foregoing, I submit that there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B of this Affidavit, are located in the **RESIDENCE**, further described in Attachment A.  I respectfully request that this Court issue a search warrant for the **RESIDENCE**, authorizing the seizure and search of the items described in Attachment B.

Respectfully submitted,

ERIKA MARIN
Special Agent
USDA-OIG

SUBSCRIBED TO AND SWORN BEFORE ME THIS 24 DAY OF SEPTEMBER, 2018

BARBARA A. McAULIFFE
United States Magistrate Judge

Reviewed and Approved as to Form this
19th day of September, 2018.

*/s/ Karen A. Escobar*
KAREN A. ESCOBAR
Assistant United States Attorney

## ATTACHMENT A



1.    The property is located at **13468 Avenue 416, Orosi, California, 93647,**

**("RESIDENCE").** The property to be searched are the structures and curtilage located at the **RESIDENCE**. The **RESIDENCE** is a single story mobile home with multiple structures that sit on approximately 17 acres of rural property. The entrance to the property is off Avenue 416 and contains a posted sign that says "Rancho El Paraiso." There is a narrow dirt driveway approximately one-quarter of a mile long before arriving at the mobile home. The mobile home is gray in color with vinyl siding and light trim. The front door faces east and opens inward from right to left. There is no security gate on the front door. There are multiple structures consisting of trailers, sheds, storage buildings, and animal pens that sit adjacent to the mobile home. A metal fence surrounds the perimeter of the **RESIDENCE**.

**ATTACHMENT B**

**<u>Items To Be Searched For, Seized, and Examined</u>**

Any item tending to establish cockfighting and firearms offenses, in violation of Title, United States Code, Section 2156 (animal fighting ventures); Title 18, United States Code, Section 922(a)(1)(A) (unlawful manufacturing/dealing in firearms); Title 26, United States Code, Section 5861(d) (receiving or possessing firearms not registered in the National Firearms Registration and Transfer Record), from beginning at a time unknown, but no later than on or about April 12, 2017, and continuing to October 1, 2018. The items to be seized include:

1.     Documents and records, by whatever means stored, pertaining to cockfighting in violation of 7 U.S.C. § 2156.

2.     Documents and records involving or pertaining to the sponsoring or exhibiting of any animal in an animal fighting venture in interstate commerce and the sale, purchase, transport, delivery, or receipt in interstate commerce of any animal for the purpose of an animal fighting venture.

3.     Addresses and/or telephone books, Rolodex, indices, and any papers reflecting names, addresses, telephone numbers, pager numbers, and/or fax numbers of bettors, fighters, participants and/or individuals with a financial interest in the property or the animal fighting venture.

4.     Documents and records indicative of ownership, dominion, or control of the premises to be searched, including receipts, tax records, utility bills, canceled checks, or deeds.

5.     Photographs, videotapes, audiotapes or other stored images or sounds of individuals involved in cockfighting or in the distribution of proceeds from cockfighting.

6.     Financial records pertaining to cockfighting and the proceeds of cockfighting.

7.     Travel-related documents, receipts, unattached vehicle tags, titles, vehicle maintenance records, or other indications of ownership, dominion, or control of vehicles used in furtherance of the criminal activity.

8.     Currency or negotiable instruments used in the furtherance of the criminal activity, obtained through the cockfighting, or obtained with the proceeds of the activity.

9.     Items, documents or records pertaining to or relating to any wire, radio, or electronic communications in furtherance of the criminal activity, to include telephones, answering machines, caller ID devices, cellular telephones, telephone account records and statements, toll records, call detail records, two-way radios, frequency lists, call signs, internet accounts, logins,

user names, e-mail, bulletin boards, or any other form of telecommunication or electronic communication.

10.　Items that would be used to conceal the criminal activity, prevent its discovery, or jeopardize the safety of agents lawfully investigating criminal activity.

11.　Calendars, appointment books, daily planners, schedules, and diaries.

12.　Documents and records concerning banking information relating to the criminal activity or relating to property that may be forfeitable as a result of its connection to the criminal conduct described in the Search Warrant Affidavit, including but not limited to, documents and other evidence related to income and expenditures, the true ownership of, purchase of, maintenance of, acquisition or insurance for, payment of taxes on, improvements of, and exercise of dominion and control over forfeitable property, to include documents related to the purchase of real property and assets, such as real estate, motor and marine vehicles, and livestock.

13.　All other records or property that constitute evidence of the commission of the offenses outlined in the Search Warrant Affidavit, fruits of crimes named in it, and property designed or intended for use or which is or has been used as the means of committing the crimes described in the affidavit.

14.　All fighting cocks, gamefowl, cockfighting paraphernalia, including but not limited to: any implements commonly referred to as gaffs, long heels, short heels, jaggers, bayonets, Texas twisters, socket knives, long knives, short knives, slashers, postizas, blades, or any other sharp implement designed to be attached in place of the natural spur of a gamecock or other fighting bird; gaff or slasher cases; gaff or knife gauges; sharpening stones; mounting blocks; leather wraps; scabbards; moleskin; tape; waxed string; sparring muffs; tie cords; cages; enclosures; portable cases used to restrain/contain/transport gamefowl; magazines, periodicals, photographs, film, videotape or writings that discuss/depict cockfighting or training/conditioning of fowl for fighting; dubbing shears; spur saws; call sheets; fight schedules; betting slips; training/conditioning records; breeding records; leg or wing bands; veterinary supplies and drugs to treat fowl; controlled substances (including methamphetamine and cocaine) used as stimulants for fowl; antibiotics or other drugs used to enhance fowl performance; needles, syringes; suture kits; written material concerning ownership of gamefowl; cockfighting schedules, phone/address/e-mail lists; cockfighting awards; constructed enclosure or pits for fighting or training gamecocks; weight scales or cocker's scales; any buckets, pails, cans or sponges to wash fowl; cockfighting rule books; fight contracts.

15.　Any firearm that does not have a lawful manufacturer stamp and serial number, any unregistered firearm (where registration is required by Title 26 of the United States Code), and unfinished lower receivers of any kind (including AR-15 unfinished lower receivers).

16.　Any items pertaining to the possession, manufacture, or distribution of illegal firearms, including lower receivers, upper receivers, grips, stocks, magazines, trigger assemblies, and barrels for AR-15-style firearms.

17. Any tools and/or equipment associated with the manufacture of firearms, including but not limited to drills, drill presses, lathes, molds, molding equipment, welding equipment, jigs, hack saws, power saws, templates, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

18. Photographs developed and undeveloped and/or videotapes or DVDs/CDs of firearms, firearm transactions, firearm parts, large sums of money and/or co-conspirators and paperwork showing the purchase, storage, disposition, or dominion and control over any firearms, firearm parts, ammunition, or any of the items described in Attachment B.

19. Records relating to the acquisition and distribution and repair of firearms, firearms parts, tools and/or equipment associated with the manufacture of machineguns, short barreled rifles and/or other firearms, including but not limited to ATF Forms 4473, California Dealer Of Record Sale (DROS) records, books, receipts, invoices, notes, ledgers, and pay/owe sheets. The records should also include, but not be limited to, bank records, vendor lists, mailings, and purchase invoices/receipts.

20. Personal telephone books, telephone records, telephone bills, address books, correspondence, notes, and papers containing names and/or telephone numbers that tends to establish communication between co-conspirators.

21. Digital evidence of items described in Attachment B, including items listed in Attachment C.

22. Evidence and records relating to the accumulation of proceeds derived from illegal firearms trafficking and manufacturing including, but not limited to, money order receipts, money transfer documents, bank records, and sales invoices/receipts.

23. Rental or lease agreements for storage units, safety deposit boxes, other storage locations, keys, combinations, and/or access codes for them.

24. Indicia of occupancy, residency, and/or ownership of the items noted above and of the premises, including but not limited to, papers, correspondence, canceled envelopes, canceled postcards, bills, and registration documents.

25. Any safes, locked cabinets, and/or other secured containers and/or devices at the locations and in/on vehicles identified in Attachment A. Law enforcement shall be permitted to open such locked containers by force or through the use of a locksmith if necessary.

26. Permission to answer, record, monitor, note, and converse with callers who appear to be calling in regards to firearms trafficking on any telephone or cellular phone within the locations set forth in Attachment A without revealing the officer's true identities.

27. Any vehicles and mobile conveyances used and/or associated with unlawful trafficking of narcotics/firearms and the manufacturing of firearms, including transporting of any such firearms, firearm parts, or variant lower receivers.

28. Any machines and/or parts/tools associated with the use and/or association of the manufacturing and/or modifying of firearms, firearm parts, AR-15 unfinished lower receivers (and firearm unfinished lower receivers of any kind) machineguns and/or machinegun parts including but not limited to templates, cutting programs, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

29. The contents of any surveillance camera or surveillance system used at any of the locations identified in Attachment A.

30. Items evidencing the receipt of income from any source including Forms W-2, and 1099, Federal and State income tax records and work papers, employment records, pay stubs, social security statements, business receipts, business books and records, journal and ledgers reflecting receipts, receipts, invoices, records from sales of assets, real estate sale and purchase records, escrow records, bank records (including foreign accounts and related transactions), brokerage records, investment account statements, receipts documenting purchase and sale of stocks, contracts, purchase orders, estate records, loan records, letters of credit, notes receivable, IOU's and other recordation of debts comprising evidence of loans receivable, documents reflecting insurance settlements, documents reflecting receipt of any assets acquired through inheritance, annuity statements, documents reflecting the receipt of income from the repayment of a loan, and documents tending to show the possession of a cash hoard, to include loan applications, balance sheets, personal budgets, and financial organizers.

31. Items evidencing the expenditure of income to include, escrow files, vehicle/vessel purchase contracts, bank statements, checks, receipts, paid invoices, check registers and checkbooks, insurance documents, wire transfer records, stored-value debit cards, documentation reflecting conversion/possession/distribution of electronic currency, loan payments, debt obligations, mortgage statements, product service contracts, shipping labels, packing slips, and installment agreements.

32. Personal calendars, diaries, address and/or telephone books and listings, rolodex style indices and papers reflecting names, addresses, telephone numbers, cellular phone numbers, fax numbers, telephone bills, correspondence by the known subjects of the investigation with associates, sources of narcotics supplies, sources of illegal weapons parts suppliers, sources of illegal weapons fabrication operators, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists.

# ATTACHMENT C

### *Computer and Electronic Evidence Protocol*

Based upon the facts and circumstances described above, there is probable cause to believe that evidence of the criminal violations previously described are maintained on computers, cellular telephones, digital devices, and electronic storage media as described in this attachment at the location described.

This Affidavit seeks permission to search for and seize evidence of the crimes described above stored on computers and electronic/digital devices (collectively "digital devices"), as well as any digital devices that constitute fruits and instrumentalities of the crimes. In preparing this Affidavit, I have consulted with experienced law enforcement agents who have received extensive training in the forensic examination of computers and digital devices. These agents related some of the technical information detailed below.

1. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that data in digital form can be stored on a variety of systems, and storage devices, or media including hard disk drives, floppy disks, compact disks, magnetic tapes, flash drives, and memory chips. Some of these devices can be smaller than a thumbnail and can take several forms, including thumb drives, secure digital media used in phones and cameras, personal music devices, and similar items.

2. Based upon my training and experience, and the investigation to date, I believe that computers, digital devices, and digital records and evidence will be found at locations identified in Attachment A.

3. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that computers and digital devices are often used to store information, very much the same way paper, ledgers, files and file cabinets are used to store information. I know that it is common today for individuals and businesses to utilize computers to conduct their legal and/or illegal business and to store information related thereto. I know based on my training and experience, that subjects who are engaged in this illegal activity commonly store information related to their activities on computers and digital devices.

## REMOVAL OF DATA STORAGE DEVICES FOR REVIEW
## IN A LABORATORY SETTING MAY BE REQUIRED

4. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that a forensic image is an exact physical copy of a data storage device. A forensic image captures all data on the subject media without viewing or changing the data in any way. Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of data for information subject to seizure pursuant to the warrant. I also know that during the search of the premises it is not always possible to create a forensic image of or search digital devices or media for data. I also know that it is frequently necessary to remove digital devices or media for later laboratory evaluation off-site under controlled circumstances. This is true for a number of reasons, including the following:

    a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. Because there are so many different types of digital devices and software in use today, it is difficult to anticipate all of the necessary technical manuals, specialized equipment, and specific expertise necessary to conduct a thorough search of the media to ensure that the data will be preserved and evaluated in a useful manner.

    b. Searching digital devices can require the use of precise, scientific procedures designed to maintain the integrity of the evidence. The recovery of such data may require the use of special software and procedures, such as those used in a law enforcement laboratory.

    c. The volume of data stored on many digital devices is typically so large that it will be highly impractical to search for data during the execution of the physical search of the premises. Storage devices capable of storing five hundred gigabytes of data are now commonplace in desktop computers. It can take several hours, or even days, to image a single hard drive. The larger the drive, the longer it takes. Depending upon the number and size of the devices, the length of time that agents must remain onsite to image and examine digital devices can become impractical.

    d. Because digital data may be vulnerable to inadvertent modification or destruction, a controlled environment, such as a law enforcement laboratory, may be essential to conduct a complete and accurate analysis of the digital devices from which the data will be extracted. Software used in a laboratory setting can often reveal the true nature of data. Moreover, a computer forensic reviewer needs a substantial

amount of time to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or an instrumentality of a crime.

e.  Analyzing the contents of a computer or other electronic storage device, even without significant technical difficulties, can be very challenging, and a variety of search and analytical methods must be used. For example, searching by keywords, which is a limited text based search, often yields thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process. The computer may have stored information about the data at issue which may not be searchable text, such as: who created it; when and how it was created, downloaded, or copied; when it was last accessed; when it was last modified; when it was last printed; and when it was deleted. The relevance of this kind of data is often contextual. Furthermore, many common email, database, and spreadsheet applications do not store data as searchable text, thereby necessitating additional search procedures. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed data requires a search of events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which users logged in, whether users shared passwords, whether a computer was connected to other computers or networks, and whether the users accessed or used other programs or services in the relevant time period, can help determine who was sitting at the keyboard.

f.  Searching digital devices can require the use of precise, scientific procedures designed to recover latent data. The recovery of such data may require the use of special software and procedures. Data that represents electronic files or remnants of such files can be recovered months or even years after it has been downloaded onto a hard drive, deleted, or viewed via the Internet. Even when such files have been deleted, data can be recovered months or years later using readily available forensic tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in space on the hard drive or other storage media that is not allocated to an active file. In addition, a computer's operating system may keep a record of deleted data in a swap or recovery file or in a program specifically designed to restore the computer's settings in the event of a system failure.

5. This warrant also seeks authority to seize contextual data (or metadata), that is, evidence of how a digital device has been used, what it has been used for and who has used it. It can be very important in criminal cases to seek "attribution" data so that an event or communication can be associated with a person. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, this authority is sought for a number of reasons:

   a. In some instances, the computer "writes" to storage media without the specific knowledge or permission of the user. Generally, data or files that have been received via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to such data or files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve artifacts of electronic activity from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer usage. Logs of access to websites, file management/transfer programs, firewall permissions, and other data assist the examiner and investigators in creating a "picture" of what the computer was doing and how it was being used during the relevant time in question. Given the interrelationships of the data to various parts of the computer's operation, this information cannot be easily segregated.

   b. Digital data on the hard drive that is not currently associated with any file may reveal evidence of a file that was once on the hard drive but has since been deleted or edited, or it could reveal a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, email programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations (or on other devices).

   c. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be learned from the absence of particular data on a digital device. Specifically, the lack of computer security software, virus

protection, malicious software, evidence of remote control by another computer system, or other programs and/or software that may assist in identifying the user indirectly and may provide evidence excluding other causes for the presence or absence of the items sought by this application. Additionally, since computer drives may store artifacts from the installation of software that is no longer active, evidence of the historical presence of the kind of software and data described may have special significance in establishing timelines of usage, confirming the identification of certain users, establishing a point of reference for usage and, in some cases, assisting in the identification of certain users. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations. Evidence of the absence of particular data on the drive is not generally capable of being segregated from the rest of the data on the drive.

## SEARCH PROCEDURE

6.  In searching for data capable of being read, stored, or interpreted by a computer, cellular telephone, digital device, or storage media, law enforcement personnel executing the search warrant will employ the following procedure:

    a.  On-site search, if practicable. Law enforcement officers trained in computer forensics (hereafter, "computer personnel"), if present, may be able to determine if digital devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data on the devices and conduct such a search if deemed practicable. Any device searched on-site will be seized if it contains any data falling within the list of items to be seized as set forth in the warrant and in Attachments B and C.

    b.  Seizure of digital devices for off-site imaging and search. If no computer personnel are present at the execution of the search warrant, or if they determine that a digital device cannot be searched or imaged on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, the digital device will be seized and transported to an appropriate law enforcement laboratory for review.

    c.  Law enforcement personnel (potentially including, but not necessarily limited to, computer personnel) will examine the digital device to determine if it contains any data that falls within the list of items to be seized as set forth in the warrant and in Attachment B and C.

d. Law enforcement personnel will use procedures designed to identify items to be seized under the warrant. These procedures may include, without limitation, the use of a "hash value" library to exclude normal operating system files that do not need to be searched. In addition, law enforcement personnel may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data falls within the list of items to be seized under the warrant.

e. If the original digital device was seized, law enforcement personnel will perform an initial search of the original digital device within a reasonable amount of time not to exceed one hundred twenty days from the date of execution of the warrant. If, after conducting the initial search, law enforcement personnel determine that an original digital device contains any data falling within the list of items to be seized pursuant to this warrant, the government will retain the original digital device to, among other things, litigate the admissibility/authenticity of the seized items at trial, ensure the integrity of the copies, ensure the adequacy of chain of custody, and resolve any issues that potentially might be raised regarding changed conditions of the evidence. If the government needs additional time to determine whether an original digital device contains any data falling within the list of items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original one hundred twenty day period from the date of execution of the warrant. Once it is determined that the device contains evidence of the above-note federal offenses, law enforcement may view and handle the device as law enforcement would any other seized piece of evidence.

f. If an original digital device does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will return that original digital device to its owner within a reasonable period of time if it can be lawfully possessed; seal any image previously made of the device; and not review the sealed image absent further authorization from the Court.

## DATA TO BE SEIZED

7. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that, in order to search for data that is capable of being read or interpreted by a computer, cellular telephone, digital device, or storage media, law enforcement personnel will need to seize, image, copy, and/or search the following items, subject to the procedures set forth herein:

a. Any computer equipment, cellular telephone, digital device, or storage media that are capable of being used to commit or further the crimes outlined above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes, as set forth in Attachments B and C.

b. Any computer equipment, cellular telephone, digital device, or storage media used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes outlined above, or to create, access, process, or store evidence, contraband, fruits, or instrumentalities of such crimes, as set forth in Attachments B and C.

c. Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes outlined above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes, as set forth in Attachments B and C.

d. Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, mobile cellular telephone, digital device, or storage media or software.

e. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, mobile cellular telephone, digital device, or storage media, or data to be searched.

f. Any physical keys, encryption devices, dongles, or similar physical items which are necessary to gain access to the computer equipment, mobile cellular telephone, digital device, storage media, or data.

g. Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, mobile cellular telephone, digital device, storage media, or data to be searched.

h. All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device,

that show the actual user of the computers or digital devices during any time period in which the device was used to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device).

i. All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device.

j. All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual information necessary to understand the evidence, contraband, fruits, or instrumentalities described in this attachment.

## **RETENTION OF IMAGE**

8. The United States will retain a forensic image of each digital storage device subjected to analysis for a number of reasons, including proving the authenticity of evidence to be used at trial; responding to any potential questions regarding the corruption of data; establishing the chain of custody of data; refuting any potential claims of fabrication, tampering, or destruction with/of data; and addressing potential exculpatory evidence claims where, for example, a defendant claims that the United States avoided its obligations by destroying data or returning it to a third party.

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of California

*ISSUED*

*SEALED COPY*

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No. **1 8 SW - 0 0 3 7 8 BAM** |
| The Residence, outbuildings, and curtilage located at | ) |
| 13468 Avenue 416, Orosi, California 93647 | ) |
| | ) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location):*

The Residence, outbuildings, and curtilage located at 13468 Avenue 416, Orosi, California 93647, more fully described in Attachment A, attached hereto and incorporated herein by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized):*

See Attachments B and C, attached hereto and incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____ 10/5/18 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 9/24/18 8:21 am _____     _____
                                                                                               *Judge's signature*

City and state:     Fresno, California     _____ Barbara A. McAuliffe, U.S. Magistrate Judge _____
                                                                           *Printed name and title*

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A

## Place To Be Searched
### 13468 Avenue 416, Orosi, California, 93647



1.     The property is located at **13468 Avenue 416, Orosi, California, 93647,**

**("RESIDENCE").** The property to be searched are the structures and curtilage located at the

**RESIDENCE.** The **RESIDENCE** is a single story mobile home with multiple structures that sit

on approximately 17 acres of rural property. The entrance to the property is off Avenue 416 and

contains a posted sign that says "Rancho El Paraiso." There is a narrow dirt driveway

approximately one-quarter of a mile long before arriving at the mobile home. The mobile home

is gray in color with vinyl siding and light trim. The front door faces east and opens inward from

right to left. There is no security gate on the front door. There are multiple structures consisting

of trailers, sheds, storage buildings, and animal pens that sit adjacent to the mobile home.

A metal fence surrounds the perimeter of the **RESIDENCE.**

# ATTACHMENT B

## Items To Be Searched For, Seized, and Examined

Any item tending to establish cockfighting and firearms offenses, in violation of Title United States Code, Section 2156 (animal fighting ventures); Title 18, United States Code, Section 922(a)(1)(A) (unlawful manufacturing/dealing in firearms); Title 26, United States Code, Section 5861(d) (receiving or possessing firearms not registered in the National Firearms Registration and Transfer Record), from beginning at a time unknown, but no later than on or about April 12, 2017, and continuing to October 1, 2018. The items to be seized include:

1.      Documents and records, by whatever means stored, pertaining to cockfighting in violation of 7 U.S.C. § 2156.

2.      Documents and records involving or pertaining to the sponsoring or exhibiting of any animal in an animal fighting venture in interstate commerce and the sale, purchase, transport, delivery, or receipt in interstate commerce of any animal for the purpose of an animal fighting venture.

3.      Addresses and/or telephone books, Rolodex, indices, and any papers reflecting names, addresses, telephone numbers, pager numbers, and/or fax numbers of bettors, fighters, participants and/or individuals with a financial interest in the property or the animal fighting venture.

4.      Documents and records indicative of ownership, dominion, or control of the premises to be searched, including receipts, tax records, utility bills, canceled checks, or deeds.

5.      Photographs, videotapes, audiotapes or other stored images or sounds of individuals involved in cockfighting or in the distribution of proceeds from cockfighting.

6.      Financial records pertaining to cockfighting and the proceeds of cockfighting.

7.      Travel-related documents, receipts, unattached vehicle tags, titles, vehicle maintenance records, or other indications of ownership, dominion, or control of vehicles used in furtherance of the criminal activity.

8.      Currency or negotiable instruments used in the furtherance of the criminal activity, obtained through the cockfighting, or obtained with the proceeds of the activity.

9.      Items, documents or records pertaining to or relating to any wire, radio, or electronic communications in furtherance of the criminal activity, to include telephones, answering machines, caller ID devices, cellular telephones, telephone account records and statements, toll records, call detail records, two-way radios, frequency lists, call signs, internet accounts, logins,

user names, e-mail, bulletin boards, or any other form of telecommunication or electronic communication.

10.     Items that would be used to conceal the criminal activity, prevent its discovery, or jeopardize the safety of agents lawfully investigating criminal activity.

11.     Calendars, appointment books, daily planners, schedules, and diaries.

12.     Documents and records concerning banking information relating to the criminal activity or relating to property that may be forfeitable as a result of its connection to the criminal conduct described in the Search Warrant Affidavit, including but not limited to, documents and other evidence related to income and expenditures, the true ownership of, purchase of, maintenance of, acquisition or insurance for, payment of taxes on, improvements of, and exercise of dominion and control over forfeitable property, to include documents related to the purchase of real property and assets, such as real estate, motor and marine vehicles, and livestock.

13.     All other records or property that constitute evidence of the commission of the offenses outlined in the Search Warrant Affidavit, fruits of crimes named in it, and property designed or intended for use or which is or has been used as the means of committing the crimes described in the affidavit.

14.     All fighting cocks, gamefowl, cockfighting paraphernalia, including but not limited to: any implements commonly referred to as gaffs, long heels, short heels, jaggers, bayonets, Texas twisters, socket knives, long knives, short knives, slashers, postizas, blades, or any other sharp implement designed to be attached in place of the natural spur of a gamecock or other fighting bird; gaff or slasher cases; gaff or knife gauges; sharpening stones; mounting blocks; leather wraps; scabbards; moleskin; tape; waxed string; sparring muffs; tie cords; cages; enclosures; portable cases used to restrain/contain/transport gamefowl; magazines, periodicals, photographs, film, videotape or writings that discuss/depict cockfighting or training/conditioning of fowl for fighting; dubbing shears; spur saws; call sheets; fight schedules; betting slips; training/conditioning records; breeding records; leg or wing bands; veterinary supplies and drugs to treat fowl; controlled substances (including methamphetamine and cocaine) used as stimulants for fowl; antibiotics or other drugs used to enhance fowl performance; needles, syringes; suture kits; written material concerning ownership of gamefowl; cockfighting schedules; phone/address/e-mail lists; cockfighting awards; constructed enclosure or pits for fighting or training gamecocks; weight scales or cocker's scales; any buckets, pails, cans or sponges to wash fowl; cockfighting rule books; fight contracts.

15.     Any firearm that does not have a lawful manufacturer stamp and serial number, any unregistered firearm (where registration is required by Title 26 of the United States Code), and unfinished lower receivers of any kind (including AR-15 unfinished lower receivers).

16.     Any items pertaining to the possession, manufacture, or distribution of illegal firearms, including lower receivers, upper receivers, grips, stocks, magazines, trigger assemblies, and barrels for AR-15-style firearms.

17. Any tools and/or equipment associated with the manufacture of firearms, including but not limited to drills, drill presses, lathes, molds, molding equipment, welding equipment, jigs, hack saws, power saws, templates, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

18. Photographs developed and undeveloped and/or videotapes or DVDs/CDs of firearms, firearm transactions, firearm parts, large sums of money and/or co-conspirators and paperwork showing the purchase, storage, disposition, or dominion and control over any firearms, firearm parts, ammunition, or any of the items described in Attachment B.

19. Records relating to the acquisition and distribution and repair of firearms, firearms parts, tools and/or equipment associated with the manufacture of machineguns, short barreled rifles and/or other firearms, including but not limited to ATF Forms 4473, California Dealer Of Record Sale (DROS) records, books, receipts, invoices, notes, ledgers, and pay/owe sheets. The records should also include, but not be limited to, bank records, vendor lists, mailings, and purchase invoices/receipts.

20. Personal telephone books, telephone records, telephone bills, address books, correspondence, notes, and papers containing names and/or telephone numbers that tends to establish communication between co-conspirators.

21. Digital evidence of items described in Attachment B, including items listed in Attachment C.

22. Evidence and records relating to the accumulation of proceeds derived from illegal firearms trafficking and manufacturing including, but not limited to, money order receipts, money transfer documents, bank records, and sales invoices/receipts.

23. Rental or lease agreements for storage units, safety deposit boxes, other storage locations, keys, combinations, and/or access codes for them.

24. Indicia of occupancy, residency, and/or ownership of the items noted above and of the premises, including but not limited to, papers, correspondence, canceled envelopes, canceled postcards, bills, and registration documents.

25. Any safes, locked cabinets, and/or other secured containers and/or devices at the locations and in/on vehicles identified in Attachment A. Law enforcement shall be permitted to open such locked containers by force or through the use of a locksmith if necessary.

26. Permission to answer, record, monitor, note, and converse with callers who appear to be calling in regards to firearms trafficking on any telephone or cellular phone within the locations set forth in Attachment A without revealing the officer's true identities.

27. Any vehicles and mobile conveyances used and/or associated with unlawful trafficking of narcotics/firearms and the manufacturing of firearms, including transporting of any such firearms, firearm parts, or variant lower receivers.

28. Any machines and/or parts/tools associated with the use and/or association of the manufacturing and/or modifying of firearms, firearm parts, AR-15 unfinished lower receivers (and firearm unfinished lower receivers of any kind) machineguns and/or machinegun parts including but not limited to templates, cutting programs, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

29. The contents of any surveillance camera or surveillance system used at any of the locations identified in Attachment A.

30. Items evidencing the receipt of income from any source including Forms W-2, and 1099, Federal and State income tax records and work papers, employment records, pay stubs, social security statements, business receipts, business books and records, journal and ledgers reflecting receipts, receipts, invoices, records from sales of assets, real estate sale and purchase records, escrow records, bank records (including foreign accounts and related transactions), brokerage records, investment account statements, receipts documenting purchase and sale of stocks, contracts, purchase orders, estate records, loan records, letters of credit, notes receivable, IOU's and other recordation of debts comprising evidence of loans receivable, documents reflecting insurance settlements, documents reflecting receipt of any assets acquired through inheritance, annuity statements, documents reflecting the receipt of income from the repayment of a loan, and documents tending to show the possession of a cash hoard, to include loan applications, balance sheets, personal budgets, and financial organizers.

31. Items evidencing the expenditure of income to include, escrow files, vehicle/vessel purchase contracts, bank statements, checks, receipts, paid invoices, check registers and checkbooks, insurance documents, wire transfer records, stored-value debit cards, documentation reflecting conversion/possession/distribution of electronic currency, loan payments, debt obligations, mortgage statements, product service contracts, shipping labels, packing slips, and installment agreements.

32. Personal calendars, diaries, address and/or telephone books and listings, rolodex style indices and papers reflecting names, addresses, telephone numbers, cellular phone numbers, fax numbers, telephone bills, correspondence by the known subjects of the investigation with associates, sources of narcotics supplies, sources of illegal weapons parts suppliers, sources of illegal weapons fabrication operators, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists.

# ATTACHMENT C

## *Computer and Electronic Evidence Protocol*

Based upon the facts and circumstances described above, there is probable cause to believe that evidence of the criminal violations previously described are maintained on computers, cellular telephones, digital devices, and electronic storage media as described in this attachment at the location described.

This Affidavit seeks permission to search for and seize evidence of the crimes described above stored on computers and electronic/digital devices (collectively "digital devices"), as well as any digital devices that constitute fruits and instrumentalities of the crimes. In preparing this Affidavit, I have consulted with experienced law enforcement agents who have received extensive training in the forensic examination of computers and digital devices. These agents related some of the technical information detailed below.

1. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that data in digital form can be stored on a variety of systems, and storage devices, or media including hard disk drives, floppy disks, compact disks, magnetic tapes, flash drives, and memory chips. Some of these devices can be smaller than a thumbnail and can take several forms, including thumb drives, secure digital media used in phones and cameras, personal music devices, and similar items.

2. Based upon my training and experience, and the investigation to date, I believe that computers, digital devices, and digital records and evidence will be found at locations identified in Attachment A.

3. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that computers and digital devices are often used to store information, very much the same way paper, ledgers, files and file cabinets are used to store information. I know that it is common today for individuals and businesses to utilize computers to conduct their legal and/or illegal business and to store information related thereto. I know based on my training and experience, that subjects who are engaged in this illegal activity commonly store information related to their activities on computers and digital devices.

## REMOVAL OF DATA STORAGE DEVICES FOR REVIEW
## IN A LABORATORY SETTING MAY BE REQUIRED

4.  Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that a forensic image is an exact physical copy of a data storage device. A forensic image captures all data on the subject media without viewing or changing the data in any way. Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of data for information subject to seizure pursuant to the warrant. I also know that during the search of the premises it is not always possible to create a forensic image of or search digital devices or media for data. I also know that it is frequently necessary to remove digital devices or media for later laboratory evaluation off-site under controlled circumstances. This is true for a number of reasons, including the following:

    a.  Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. Because there are so many different types of digital devices and software in use today, it is difficult to anticipate all of the necessary technical manuals, specialized equipment, and specific expertise necessary to conduct a thorough search of the media to ensure that the data will be preserved and evaluated in a useful manner.

    b.  Searching digital devices can require the use of precise, scientific procedures designed to maintain the integrity of the evidence. The recovery of such data may require the use of special software and procedures, such as those used in a law enforcement laboratory.

    c.  The volume of data stored on many digital devices is typically so large that it will be highly impractical to search for data during the execution of the physical search of the premises. Storage devices capable of storing five hundred gigabytes of data are now commonplace in desktop computers. It can take several hours, or even days, to image a single hard drive. The larger the drive, the longer it takes. Depending upon the number and size of the devices, the length of time that agents must remain onsite to image and examine digital devices can become impractical.

    d.  Because digital data may be vulnerable to inadvertent modification or destruction, a controlled environment, such as a law enforcement laboratory, may be essential to conduct a complete and accurate analysis of the digital devices from which the data will be extracted. Software used in a laboratory setting can often reveal the true nature of data. Moreover, a computer forensic reviewer needs a substantial

amount of time to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or an instrumentality of a crime.

e. Analyzing the contents of a computer or other electronic storage device, even without significant technical difficulties, can be very challenging, and a variety of search and analytical methods must be used. For example, searching by keywords, which is a limited text based search, often yields thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process. The computer may have stored information about the data at issue which may not be searchable text, such as: who created it; when and how it was created, downloaded, or copied; when it was last accessed; when it was last modified; when it was last printed; and when it was deleted. The relevance of this kind of data is often contextual. Furthermore, many common email, database, and spreadsheet applications do not store data as searchable text, thereby necessitating additional search procedures. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed data requires a search of events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which users logged in, whether users shared passwords, whether a computer was connected to other computers or networks, and whether the users accessed or used other programs or services in the relevant time period, can help determine who was sitting at the keyboard.

f. Searching digital devices can require the use of precise, scientific procedures designed to recover latent data. The recovery of such data may require the use of special software and procedures. Data that represents electronic files or remnants of such files can be recovered months or even years after it has been downloaded onto a hard drive, deleted, or viewed via the Internet. Even when such files have been deleted, data can be recovered months or years later using readily available forensic tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in space on the hard drive or other storage media that is not allocated to an active file. In addition, a computer's operating system may keep a record of deleted data in a swap or recovery file or in a program specifically designed to restore the computer's settings in the event of a system failure.

5. This warrant also seeks authority to seize contextual data (or metadata), that is, evidence of how a digital device has been used, what it has been used for and who has used it. It can be very important in criminal cases to seek "attribution" data so that an event or communication can be associated with a person. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, this authority is sought for a number of reasons:

   a. In some instances, the computer "writes" to storage media without the specific knowledge or permission of the user. Generally, data or files that have been received via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to such data or files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve artifacts of electronic activity from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer usage. Logs of access to websites, file management/transfer programs, firewall permissions, and other data assist the examiner and investigators in creating a "picture" of what the computer was doing and how it was being used during the relevant time in question. Given the interrelationships of the data to various parts of the computer's operation, this information cannot be easily segregated.

   b. Digital data on the hard drive that is not currently associated with any file may reveal evidence of a file that was once on the hard drive but has since been deleted or edited, or it could reveal a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, email programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations (or on other devices).

   c. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be learned from the absence of particular data on a digital device. Specifically, the lack of computer security software, virus

protection, malicious software, evidence of remote control by another computer system, or other programs and/or software that may assist in identifying the user indirectly and may provide evidence excluding other causes for the presence or absence of the items sought by this application. Additionally, since computer drives may store artifacts from the installation of software that is no longer active, evidence of the historical presence of the kind of software and data described may have special significance in establishing timelines of usage, confirming the identification of certain users, establishing a point of reference for usage and, in some cases, assisting in the identification of certain users. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations. Evidence of the absence of particular data on the drive is not generally capable of being segregated from the rest of the data on the drive.

## **SEARCH PROCEDURE**

6. In searching for data capable of being read, stored, or interpreted by a computer, cellular telephone, digital device, or storage media, law enforcement personnel executing the search warrant will employ the following procedure:

   a. On-site search, if practicable. Law enforcement officers trained in computer forensics (hereafter, "computer personnel"), if present, may be able to determine if digital devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data on the devices and conduct such a search if deemed practicable. Any device searched on-site will be seized if it contains any data falling within the list of items to be seized as set forth in the warrant and in Attachments B and C.

   b. Seizure of digital devices for off-site imaging and search. If no computer personnel are present at the execution of the search warrant, or if they determine that a digital device cannot be searched or imaged on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, the digital device will be seized and transported to an appropriate law enforcement laboratory for review.

   c. Law enforcement personnel (potentially including, but not necessarily limited to, computer personnel) will examine the digital device to determine if it contains any data that falls within the list of items to be seized as set forth in the warrant and in Attachment B and C.

d. Law enforcement personnel will use procedures designed to identify items to be seized under the warrant. These procedures may include, without limitation, the use of a "hash value" library to exclude normal operating system files that do not need to be searched. In addition, law enforcement personnel may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data falls within the list of items to be seized under the warrant.

e. If the original digital device was seized, law enforcement personnel will perform an initial search of the original digital device within a reasonable amount of time not to exceed one hundred twenty days from the date of execution of the warrant. If, after conducting the initial search, law enforcement personnel determine that an original digital device contains any data falling within the list of items to be seized pursuant to this warrant, the government will retain the original digital device to, among other things, litigate the admissibility/authenticity of the seized items at trial, ensure the integrity of the copies, ensure the adequacy of chain of custody, and resolve any issues that potentially might be raised regarding changed conditions of the evidence. If the government needs additional time to determine whether an original digital device contains any data falling within the list of items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original one hundred twenty day period from the date of execution of the warrant. Once it is determined that the device contains evidence of the above-note federal offenses, law enforcement may view and handle the device as law enforcement would any other seized piece of evidence.

f. If an original digital device does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will return that original digital device to its owner within a reasonable period of time if it can be lawfully possessed; seal any image previously made of the device; and not review the sealed image absent further authorization from the Court.

## DATA TO BE SEIZED

7. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that, in order to search for data that is capable of being read or interpreted by a computer, cellular telephone, digital device, or storage media, law enforcement personnel will need to seize, image, copy, and/or search the following items, subject to the procedures set forth herein:

a. Any computer equipment, cellular telephone, digital device, or storage media that are capable of being used to commit or further the crimes outlined above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes, as set forth in Attachments B and C.

b. Any computer equipment, cellular telephone, digital device, or storage media used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes outlined above, or to create, access, process, or store evidence, contraband, fruits, or instrumentalities of such crimes, as set forth in Attachments B and C.

c. Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes outlined above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes, as set forth in Attachments B and C.

d. Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, mobile cellular telephone, digital device, or storage media or software.

e. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, mobile cellular telephone, digital device, or storage media, or data to be searched.

f. Any physical keys, encryption devices, dongles, or similar physical items which are necessary to gain access to the computer equipment, mobile cellular telephone, digital device, storage media, or data.

g. Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, mobile cellular telephone, digital device, storage media, or data to be searched.

h. All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device,

that show the actual user of the computers or digital devices during any time period in which the device was used to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device).

i. All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device.

j. All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual information necessary to understand the evidence, contraband, fruits, or instrumentalities described in this attachment.

## RETENTION OF IMAGE

8. The United States will retain a forensic image of each digital storage device subjected to analysis for a number of reasons, including proving the authenticity of evidence to be used at trial; responding to any potential questions regarding the corruption of data; establishing the chain of custody of data; refuting any potential claims of fabrication, tampering, or destruction with/of data; and addressing potential exculpatory evidence claims where, for example, a defendant claims that the United States avoided its obligations by destroying data or returning it to a third party.